Stephen D. McCORMICK,
Appellant–Petitioner,

v.

Helen A. McCORMICK, Appellee–
Respondent.

No. 22A05–0206–CV–289.

Court of Appeals of Indiana.

Jan. 14, 2003.

John A. Kraft, Young, Lind, Endres & Kraft, New Albany, IN, Attorney for Appellant.

Matthew J. Schad, Schad & Schad, P.C., New Albany, IN, Attorney for Appellee.

## OPINION

FRIEDLANDER, Judge.

Stephen D. McCormick filed a petition with the trial court seeking revocation of his spousal maintenance obligation to his former wife, Helen A. McCormick. The trial court denied the petition for revocation and slightly modified Stephen's maintenance obligation. Stephen presents the following restated issue for review: Did the trial court abuse its discretion in denying Stephen's request to revoke his spousal maintenance obligation?

We affirm in part and reverse in part.

The facts most favorable to the judgment reveal that Stephen and Helen were married on June 22, 1968, and two children were born of the marriage. During the marriage, Helen was first diagnosed with Multiple Sclerosis (MS) in 1979. The marriage was subsequently dissolved on May 14, 1990, at a time when Helen was not working. In addition to other matters relating to child support and property division, the court also provided for spousal maintenance in the dissolution order as follows:

That the Court finds that [Helen] is presently disabled due to Multiple Sclerosis and [Stephen] should pay [Helen] the amount of Six Hundred Dollars ($600.00) a month beginning June 1, 1990, said amount payable to the Office of the Floyd Circuit Court Clerk until [Helen] receives disability from a governmental agency at which time a hearing will be held to determine an amount for maintenance, if any, to be paid.

*Appendix* at 156.

Although it was slightly modified from time to time, Stephen continued to pay maintenance to Helen.[1] On April 7, 1995, Stephen and Helen entered into an Agreed Modification, which confirmed an earlier emancipation of their daughter, declared their son to be emancipated, and ceased all child support obligations. In addition, the court-approved agreement provided:

All other terms and conditions of the Decree of Dissolution of Marriage, as modified, should remain in full force and effect, including, but not limited to, [Stephen's] responsibility to pay to [Helen] $500.00 per month in maintenance.

*Appendix* at 172. At the time of this agreement, Helen was working part-time at a temporary agency. Her inability to work full-time was based in part on both the unavailability of work and on her medical condition. Helen was also one month away from obtaining a degree in business management from Ivy Tech State College, which she received in May 1995.

Three years later, in May 1998, Helen began working full-time at the United States Bureau of the Census (Census Bureau) in Jeffersonville, Indiana, as a statistical clerk. Helen worked at the Census Bureau consistently for several years, earning a salary of $22,531 by 2001 and receiving health insurance benefits. On

---

1. In 1992, the maintenance obligation was reduced to $400 per month, and Stephen was made responsible for paying Helen's health insurance premium in the amount of $153.42 per month. Then in 1993, as a result of the loss of employer-provided health insurance coverage for Helen through Stephen's employer, the maintenance obligation was increased to $500 per month to be used to cover her maintenance, health insurance premium, and prescription drug expense.

January 25, 2002, however, Helen was laid off from the Census Bureau. She was not called back to the Census Bureau until May 15, 2002. Further, as of May 29, Helen expected to be laid off again on May 31, 2002.

On July 16, 2001, Stephen filed a verified petition to terminate and/or modify maintenance. After several delays and a change of venue from judge, the trial court held an evidentiary hearing on Stephen's petition on May 29, 2002.

At the hearing, Helen acknowledged that her medical condition has slightly improved since her divorce and that she was now able to work full time. Helen explained that her physical limitations still include instability, limited mobility,[2] and inability to lift objects over five or ten pounds. She further noted that MS causes her loss of bladder control, nervousness, and difficulty concentrating. Helen testified that while there are higher paying jobs within the Census Bureau, they are not available to her because of her health condition. With respect to the Census Bureau, Helen testified that there is no guarantee that she will be called back to work and that her job prospects in the economy at large are "very much" limited due to her physical limitations. *Transcript* at 19. Helen further explained that despite her degree from Ivy Tech, she has not found any companies that would like to hire her, a fifty-two-year-old woman with MS, into their management structure.

At the time of the hearing, Helen was living in a mobile home that she was in the process of purchasing on contract. The parties' twenty-six-year-old son was living with her free of charge. When asked if she needed the maintenance payments, Helen replied, "It helps out quite a bit now that Doug's going to be living with me again. It will help out on the grocery bill." *Transcript* at 24. Helen acknowledged, however, that if she were to keep her job at the Census Bureau, she could probably support herself if Doug were not living with her.[3]

Stephen testified that his employment situation had recently changed. The Phillip Morris plant in which he worked closed in 2000, and Stephen opted to take early retirement. Prior to the plant closure, Stephen had been earning on average between $54,000 and $70,000 per year at Phillip Morris. Stephen received income of over $96,000 in 2000, which reflected his early retirement payout. In addition to his severance package, he earns $2,230.20 per month in retirement income. Stephen held a seasonal part-time job for a few months following his early retirement. While he was unemployed at the time of the hearing, Stephen testified that he planned to obtain another part-time job. At age fifty-two, Stephen explained that he did not intend to look for full-time employment saying, "Well, to be honest with you, I think I deserve it." *Transcript* at 50. Finally, Stephen acknowledged that his current wife's income makes it easier for him to plan not to work full time.

At the conclusion of the evidentiary hearing, the trial court made the following oral judgment:

> You, yourself said that your MS has gotten better than it was ten years ago.

---

**2.** Helen's medical condition requires her to use a cane or walker to move around, and for safety reasons, the Census Bureau actually requires her to move about in a scooter at work.

**3.** Stephen's counsel asked Helen at the hearing, "Is it a fair statement that based upon your forty (40) hour a week job with a business degree that you are currently able to support yourself if your son were not living with you?" Helen answered, "Probably." *Transcript* at 26.

That's unusual. I think they have made some strides with medication with that. So that's a bit interesting. Um, I'm going to rule this way. I think it's the fairest thing to do. Um, when she is employed at a rate she is capable of being employed at. Uh, I think it was like $22,000.00 a year. She should still receive a $300.00 a month maintenance. In the times in which she is not employed, though I think it should remain at $500.00. Now, not employed can be laid off or the illness. Maybe she cannot—then it goes back to the original amount. And that's—seems to me to be fair at this particular point.

*Transcript* at 57. The trial court entered a written order on June 10, 2002, which provides in relevant part:

1. That [Stephen] shall continue to pay maintenance in the sum of $500.00 per month to [Helen] in those months when [Helen] is unable to work full time.

2. That [Stephen] shall pay maintenance in the amount of $300.00 per month for any month in which [Helen] is working full time.

* * *

*Appendix* at 12. Stephen now appeals, arguing that the trial court abused its discretion when it failed to terminate maintenance.

██ A trial court has broad discretion to modify a spousal maintenance award, and we will reverse only upon an abuse of that discretion. *Lowes v. Lowes,* 650 N.E.2d 1171 (Ind.Ct.App.1995). "Discretion is a privilege afforded a trial court to act in accord with what is fair and equitable under the facts of each case." *In re Marriage of Dillman,* 478 N.E.2d 86, 88 (Ind.Ct.App.1985). We will find an abuse of discretion only where the trial court's decision is clearly against the logic and

effect of the facts and circumstances before the court, or the reasonable, probable, and actual deductions to be drawn therefrom. *Lowes v. Lowes,* 650 N.E.2d 1171.

The trial court awarded incapacity maintenance to Helen in 1990 pursuant to Ind. Code Ann. § 31–15–7–2(1) (West 1998). Under that provision, a trial court may award maintenance if it finds the spouse to be "physically or mentally incapacitated to the extent that the ability of the incapacitated spouse to support himself or herself is materially affected[.]" *Id.* The burden is on the party moving for a subsequent modification of the maintenance award to show "changed circumstances so substantial and continuing" as to make the terms of the existing maintenance order unreasonable. IC § 31–15–7–3(1) (West 1998); *see also Boruff v. Boruff,* 602 N.E.2d 180 (Ind.Ct.App.1992).

Stephen argues that the only logical conclusion from the evidence presented at the hearing is that there have been changed circumstances so substantial and continuing as to make the terms of the present maintenance obligation unreasonable. In particular, he observes that since entry of the 1995 modification, Helen has obtained a college degree, has worked full time for several years at the Census Bureau with a current salary of $22,531, has employer-provided health insurance coverage, and can now support herself. Stephen notes further that his employment situation has changed due to the plant closure.

On the other hand, Helen contends that the trial court's judgment is amply supported by evidence that her MS materially affects her job opportunities, both at the Census Bureau and with other employers. With respect to Stephen's economic circumstances, Helen maintains that he is voluntarily underemployed and receives the benefit of a substantial monthly retirement check.

Inherent in the trial court's judgment is a determination that, to a certain extent, the underlying medical and/or economic circumstances that supported the 1995 maintenance award have changed. The trial court's judgment also recognizes the tenuous grip Helen evidently has on her employment at the Census Bureau. The trial court balanced these considerations in a creative attempt to reach a fair and equitable result.[4]

While we acknowledge the broad discretion afforded a trial court to act in accord with what is fair and equitable in each case, we find that the trial court abused its discretion in awarding maintenance during periods when Helen is working full time at the Census Bureau. The evidence at the hearing revealed that for several years Helen has possessed the physical capability to work full time in her position at the Census Bureau. Helen has an annual salary of over $22,000 and receives health insurance benefits from her employer. For a period of time, she was placing twenty dollars per pay period into a savings account. She also recently purchased a mobile home on contract, with monthly payments of $412 per month. Most notably, Helen acknowledged at trial that with her job at the Census Bureau, she could probably support herself if her twenty-six-year-old son were not living with her.[5] This evidence reveals that when employed full time as a statistical clerk at the Census Bureau, Helen's circumstances are so much improved from 1995 that she is capable of supporting herself.

We reject Helen's rationale that limited job opportunities necessarily amount to a material affect on an incapacitated spouse's self-supportive ability. Although these may often go hand in hand, the essential inquiry is whether the incapacitated spouse has the ability to support himself or herself.[6] *See Wilhelm v. Wilhelm,* 397 N.E.2d 1079, 1081 (Ind.Ct.App. 1979) ("[a] maintenance ... award is designed to help provide for a spouse's sustenance and support"); *Farthing v. Farthing,* 178 Ind.App. 336, 344, 382 N.E.2d 941, 946 (1978) (finding that wife's housekeeping arrangement, in which she received room and board only, would not provide wife "the means to support herself totally"). While there may be superior jobs for which Helen would otherwise qualify if not for her physical limitations, it is evident that her position at the Census Bureau, when available, provides the necessary means for Helen to fully support herself. Therefore, we reverse the trial court's award of maintenance in the

---

4. The type of contingent judgment entered by the trial court in the instant case might not be recommended in most instances. The imminent possibility that Helen will be laid off again, however, renders the judgment seemingly more efficient and clearly within the trial court's discretion to do what is fair and equitable under the circumstances of each case.

5. Helen further stated that the maintenance payments help out on the grocery bill now that Doug is living with her. We note that Stephen is not legally obligated to assist Helen, through maintenance payments or otherwise, with her support of their adult son.

6. We have recognized that the maintenance statute creates a flexible standard that allows a trial court to consider whether any incapacity significantly affects a spouse's ability to support himself or herself and that the degree of employability is an inextricable factor in this determination. *See In re Marriage of Dillman,* 478 N.E.2d 86. "A spouse may suffer an affliction which would only minimally affect the self-supportive ability of a highly skilled person. That same malady, however, may materially affect the self-supportive ability of one who, even without the incapacity, is marginally employable, or only employable in physically demanding jobs." *Id.* at 88.

amount of $300 per month when Helen is working full time at the Census Bureau.

We turn now to the portion of the judgment that ordered the continuation of maintenance when Helen is unable to work full time. The record reveals the current instability of Helen's employment with the Census Bureau. At the time of the hearing, Helen reported that prior to her recent return to the Census Bureau, she had been laid off for nearly four month and that she expected to be laid off again in two days.

Moreover, the record reveals the limited employment opportunities Helen faces due to her medical condition when not employed at the Census Bureau. We note that the maintenance statute requires the trial court to realistically appraise a spouse's employment opportunities, keeping in mind both the type and degree of spouse's incapacity and the spouse's present skills and experience. *See In re Marriage of Dillman*, 478 N.E.2d 86. Here, the fact that Helen has the ability to work a forty-hour week as a statistical clerk does not mean that she has the ability to work full time in another position that may be more physically demanding. *Id.* at 88 ("the fact that a spouse is able to perform some job or even that she is currently employed does not necessarily make maintenance inappropriate"). Further, the trial court was not required to find that Helen's degree from Ivy Tech substantially improved her self-supportive ability, as compared to her ability in 1995 when she was one month away from graduating.[7] It was within the trial court's discretion to determine that Helen's self-supportive

ability, when not employed at the Census Bureau, had not changed so substantially from 1995 to make the maintenance award unreasonable.

It was similarly within the trial court's discretion to conclude that Stephen's economic circumstances had not changed so substantially as to make the maintenance award unreasonable. The evidence reveals that he elected to take early retirement at the age of fifty-two. In addition to a substantial severance payment at the time of his retirement, he continues to receive retirement income of nearly $27,000 per year. On top of this income, Stephen has the capability of working full time, though he has voluntarily chosen not to exercise this option.

We affirm the portion of the judgment that ordered continuation of maintenance when Helen is unable to work full time at the Census Bureau.[8] The portion ordering maintenance, at a reduced amount, during periods of employment at the Census Bureau is reversed.

Judgment affirmed in part and reversed in part.

NAJAM and SHARPNACK, JJ., concur.

---

7. We observe that Helen did not even obtain her job at the Census Bureau until three years after she received her degree.

8. Contrary to Stephen's assertions, it is irrelevant whether Helen's inability to work at the Census Bureau is based on her medical condition or on being laid off. In either instance, the relevant inquiry is whether her ability to support herself through other employment is materially affected by her MS.